**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**KIMBERLY STANTON,**

Plaintiff,

v.

**CHRISTINE WORMUTH,**
**Secretary of the Army,**

Defendant.[1]

**No. 21-cv-1340-MAU**

---

**MEMORANDUM OPINION**

Plaintiff Kimberly Stanton ("Stanton") brings this action against Defendant Secretary of the United States Department of the Army Corps of Engineers ("Defendant" or "Corps"), alleging one count of unlawful sexual harassment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. *See* ECF No. 1 ¶¶ 26-32. Stanton argues that she was an employee of the Corps while serving as a marine endangered species observer aboard a Corps vessel where the alleged harassment occurred and that she has established a prima facie case of harassment under Title VII. *See generally* ECF No. 10.

Before the Court is the Corps' Motion for Summary Judgment, ECF No. 9. Upon consideration of the Parties' submissions,[2] relevant legal authorities, and the entire record, the Court **GRANTS** the Corps' motion.

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), Christine Wormuth, current Secretary of the United States Army, has been substituted for John Whitley.

[2]     The Court has considered Stanton's Complaint, ECF No. 1; Defendant's Motion for Summary Judgment, ECF No. 9; Stanton's Opposition to Defendant's Motion for Summary Judgment, ECF No. 10; and, Defendant's Reply in Support of its Motion for Summary Judgment, ECF No. 11.

## FACTUAL SUMMARY

From November to December 2014, Stanton worked as a Marine Endangered Species Observer aboard the U.S. Army Corps of Engineers vessel Dredge Wheeler.  ECF No. 9-3 ¶¶ 1, 2.  The Corps used the Wheeler as part of a dredging operation in Freeport and Corpus Christi, Texas and contracted with Stanton's employer, East Coast Observers, Inc., to provide two observers aboard the vessel.  *See* ECF No. 9-12.  The observers' role was to report any sea turtle activity to the National Marine Fisheries Service (NMFS) in compliance with the Endangered Species Act of 1973.  ECF No. 9-3 ¶¶ 3, 4.  Stanton and her supervisor, Leslie Osborne, were to "monitor all flow screens 24 hours per day, do necessary NMFS daily, incident and summary reporting, clean screens, and process live, injured, and/or deceased endangered animals in accordance with NMFS approved procedures."  *Id.* ¶ 7.  Osborne served as the "lead" observer aboard the Wheeler.  ECF No. 9-4 at 35:14-18.

The Corps provided minimal services to Stanton and Osborne while they were on the vessel.  As part of the contract between East Coast Observers and the Corps, the Corps provided the observers lodging and meals as well as use of a fax machine and telephone twenty-four hours a day so that the observers might comply with their reporting requirements.  ECF No. 9-3 ¶ 7.  The observers were required to reimburse the Corps for all lodging and meals.  ECF No. 9-8 at 3.  Captain Edward Morehouse provided operational and safety information as part of an initial orientation and fielded any of Stanton's logistical questions or concerns.  ECF No. 9-5 at 2.  Unlike Army employees aboard the vessel, Stanton was not issued a common access card and, accordingly, was not able to assess any Corps computers.  ECF No. 9-4 at 42:11-22.  During non-working hours, Stanton was free to move about the Wheeler, but largely stayed in her room.  *Id.* at 43:21-22; 44:1-12.

Stanton alleges that on December 9 and 16, 2014, Mark Griffin, a 3rd Mate on the Wheeler, sexually and physically assaulted her.  ECF No. 10-1 ¶ 5.  Stanton reported the incidents to Randy Valles, Assistant Master of the Wheeler, on December 17, 2014.  *Id.*  Valles responded to Stanton that he would inform Captain Morehouse and that action would be taken.  *Id.* ¶ 6.  Valles also advised other crewmembers to refrain from contacting Stanton outside of work obligations.  ECF No. 9-9 at 11.  Stanton also alleges that on December 21, 2014, another crewmember on the vessel, Ivan Danilichav, physically assaulted her after they got into a disagreement.  ECF No. 10-1 ¶ 7.  Griffin and Danilichav both deny that they physically or sexually assaulted Stanton.  ECF No. 9-3 ¶¶ 11-12.

Stanton sent a text message to Captain Morehouse in the middle of the night on December 21, 2014, to which Captain Morehouse responded the next morning.  ECF No. 9-5 at 3.  Captain Morehouse told her that he would investigate her allegations and asked if she needed medical attention.  *Id.*  Stanton declined medical attention and met with Captain Morehouse later that evening, after which Captain Morehouse reported the incident to Army Corps of Engineers leadership via a Commander's Critical Information Report.  *Id.*  Captain Morehouse further directed Stanton to stay in her room while he worked to inform the authorities.  *Id.* at 4.  Captain Morehouse testified that Stanton refused to remain in her room, which compelled him to threaten to forcibly remove her from the ship.  *Id.*  Stanton claims this demand was made upon threat of arrest.  ECF No. 10-1 ¶ 9.  On December 22, 2014, Stanton was escorted off the ship to make a statement to authorities but, according to Captain Morehouse, declined to do so.  *Id.* at 4.  Stanton claims that she gave a statement to the local authorities but did not press charges.  ECF No. 9-4 at 80:19-25.  Shortly thereafter, Stanton purchased a plane ticket to return to her family home.  *Id.* at 83:19-25.  She did not return to the Wheeler.  *Id.*  East Coast Observers attempted to get in touch

with her but could not do so.  ECF No. 10-4 at 39-40.  The Corps began the first of two investigations on December 30, 2014.  ECF No. 9-9 at 1.  Neither investigation substantiated Stanton's assault claims.  *Id.* at 7.

**PROCEDURAL HISTORY**

On April 15, 2015, Stanton filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which rendered a final decision on August 23, 2018.  ECF No. 10-1 ¶ 2. Stanton claimed that two Wheeler crewmembers assaulted her while she was aboard the Wheeler and that the Corps retaliated against her after she reported the allegations.  ECF No. 10-2.  The EEOC determined that Stanton failed to initiate timely contact with an EEO counselor.  ECF No. 10-4 at 3.  The EEOC found, however, that the Corps qualified as her employer and retaliated against her for having engaged in the protected activity of having reported harassment.  ECF No. 10-2; ECF No. 10-4 at 40-43.

On September 24, 2018, Stanton appealed the Final Agency Decision on the denial of her sexual harassment claim.  ECF No. 10-1 at 5-6.  Her appeal was dismissed on August 19, 2020. *Id.*  She then filed a request for reconsideration on August 27, 2020, which the EEOC denied on February 25, 2021.  *Id.*  Stanton filed this Complaint on May 17, 2021.  *Id*.

**ANALYSIS**

## I.      Standard of Review

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott*

4

*v. Harris*, 550 U.S. 372, 380 (2007). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson* 477 U.S. at 248. The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

In opposing summary judgment, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" and, instead, must point to *specific record facts* that reflect a genuine issue warranting trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In doing so, the non-movant must cite competent, admissible evidence and may not rely on "statements that are impermissible hearsay or that are not based on personal knowledge." *Shuler v. District of Columbia*, 744 F. Supp. 2d 320, 327 (D.D.C. 2010) (internal citation and quotation marks omitted). Conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II.      Plaintiff's Standing to Raise a Title VII Claim

The Corps' summary judgment motion turns largely on whether Stanton has standing to bring a Title VII claim. In a Title VII action against the federal government, a plaintiff must be "in a direct employment relationship with a government employer." *Spirides v. Reinhardt*, 613 F.2d 826, 829 (D.C. Cir. 1979). "Status as an employee is therefore of crucial significance for those seeking to redress alleged discriminatory actions in federal employment." *Id.* at 829-30. Individuals who are independent contractors or those not directly employed by the federal

government are not protected by Title VII. *See Palmer v. Napolitano*, 867 F. Supp. 2d 120, 123 (D.D.C. 2012); *see also Rogler v. Gallin*, 402 Fed. Appx. 530, 531 (D.C. Cir. 2010) (citing *Spirides*, 613 F.2d at 829-30).

In arguing that she has standing under Title VII, Stanton relies almost exclusively on the EEOC's finding that the Corps was her joint employer. ECF No. 10-1 at 8-11. In doing so, Stanton fails to make any robust argument as to the facts of this case and instead argues that the doctrine of *res judicata* bars this Court from conducting its own analysis. *Id.* Stanton insists that this Court must instead defer to the EEOC's determination that the Corps was Stanton's joint employer. *Id.* In response, the Corps argues that this Court is not bound by the EEOC determination because Title VII precludes it, the EEOC was not acting in a judicial capacity in these proceedings, and that the parties did not have a full and fair opportunity to litigate the issue of Stanton's employment. ECF No. 11 at 1-3. According to the Corps, the undisputed facts here reflect that Stanton was an independent contractor and that the Corps was neither her employer nor joint employer. ECF No. 9-1 at 8-9.

### a. Claim Preclusion and the EEOC Finding

Courts are not bound by judicially-unreviewed administrative findings. *See Davis v. Joseph J. Magnolia*, Inc., 815 F. Supp. 2d 270, 275 (D.D.C. 2011) (finding an unreviewed administrative decision from the DC Office of Human Rights non-binding in a Title VII case); *see also Najjar-Nejad v. George Wash. Univ.*, 37 F. Supp. 3d 90, 146 (D.D.C. 2014) (same); *Hill v. Gray*, 28 F. Supp. 3d 47, 62 (D.D.C. 2014) ("Because the Office of Employee Appeals did not address Ms. Hill's discrimination claim under Title VII or the ADEA, and because the Office of Employee Appeals' final order is 'judicially unreviewed,' there is no preclusive effect on Ms.

Hill's discrimination claims.") (citing *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 106 (1991)).

Yet, in some circumstances, administrative agency decisions made in a judicial capacity may serve to preclude certain issues and claims. *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005). "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421-22 (1966).

As the Supreme Court and the D.C. Circuit have recognized, however, no such preclusion occurs in the Title VII context. *See University of Tennessee v. Elliott*, 478 U.S. 788, 795 (1986) ("Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims"); *see also Murray*, 406 F.3d at 713 (citing *Elliott*, 478 U.S. at 788); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 470 n.7 (1982) ("Since it is settled that decisions by the EEOC do not preclude a trial de novo in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review even if such a decision were to be afforded preclusive effect in a State's own courts."); *Chandler v. Roudebush*, 425 U.S. 840, 848 (1976) ("The legislative history of the 1972 amendments reinforces the plain meaning of the statute and confirms that Congress intended to accord federal employees the same right to a trial de novo [following administrative proceedings] as is enjoyed by private-sector employees and employees of state governments and political subdivisions under the amended Civil Rights Act of 1964."). As the D.C. Circuit has recognized, Congress expressly provided for district courts to conduct a de novo review of claims in Title VII cases. *See Payne v. Salazar*, 619 F.3d 56, 62 (D.C. Cir. 2010) ("Rather, it was the lower court's view that a judge could choose to apply de novo

review in some cases and mere 'record review' in others. [T]he Supreme Court] rejected this approach, noting that Congress, 'faced [with] a choice between record review of agency action based on traditional appellate standards and trial de novo of Title VII claims,' had chosen the latter to govern in all cases.").

Courts in this District have followed this principle in Title VII cases. *See Antrum v. Wash. Metro. Area Transit Auth.*, 710 F. Supp. 2d 112, 120 (D.D.C. 2010) ("To be sure, the EEOC reached a contrary conclusion, stating that 'the evidence establishes reasonable cause to believe that [WMATA] has committed multiple violations of Title VII.'  As a threshold matter, the EEOC findings do not have any binding effect in a collateral Title VII civil action."); *see also Hodge v. United Airlines*, 821 F. Supp. 2d 181, 187 (D.D.C. 2011) (collecting cases for the proposition that EEOC determinations are not binding in collateral Title VII civil actions).

The cases Stanton cites are inapposite, as they do not arise in the specific context of Title VII.  *See Utah Constr. & Mining Co.*, 384 U.S. at 421-22 (affording binding weight to an administrative body where the Advisory Board of Contract Appeals acted in a "judicial capacity"); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979) (deferring to an administrative body where the parties received a full and fair opportunity to litigate an issue in a prior SEC action); *Elliot*, 478 U.S. at 798 (finding an agency determination binding where an administrative law judge conducted an extensive hearing but observing, "[I]t would make little sense for Congress to write such a provision if state agency findings were entitled to preclusive effect in Title VII actions in federal court.").

Here, the EEOC's finding that the Corps was a "joint employer" was made as part of an unreviewed administrative determination.  In light of Congress' intent with respect to Title VII cases and the binding case law, the EEOC's determination does not have preclusive effect on this

Court's determination of the same issue. *See Francis v. District of Columbia*, 731 F. Supp. 2d 56, 72 n.7 (D.D.C. 2010) (citing *Scott v. Johanns*, 409 F.3d 466, 469 (D.C. Cir. 2005) ("[i]t is well established that an EEOC determination does not have any binding effect in a collateral Title VII civil action").

### b.  Whether the Corps was Stanton's "Joint Employer"

Under the joint employer doctrine, "[t]wo separate entities may be joint employers of a single same workforce if they share or co-determine those matters governing *essential terms and conditions of employment*." *Dunkin' Donuts Mid-Atl. Distrib. Ctr., Inc. v. NLRB*, 363 F.3d 437, 440 (D.C. Cir. 2004) (emphasis added). The D.C. Circuit has "recognized two largely overlapping articulations of the test for identifying joint-employer status." *Al-Saffy v. Vilsack*, 827 F.3d 85, 96 (D.C. Cir. 2016). The "*Spirides* test"—based on *Spirides v. Reinhardt*, 613 F.2d 826 (D.C. Cir. 1979)—considers the "economic realities of the work relationship" and "calls for application of general principles of the law of agency to undisputed or established facts." *Id.* at 831. If there is the "right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Id.* at 831-32.

The other test is set forth in *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117 (3d Cir. 1982). As with the *Spirides* test, the "Browning-Ferris test" considers whether the employer, "while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* at 1123. Although the D.C. Circuit has not stated which test is preferred in this jurisdiction, "the touchstone is *control*." *Al-Saffy*, 827 F.3d at 97 (emphasis added).

9

Here, the Court need not resolve which test controls, as the result would be the same under either one. *See, e.g., Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 113 (D.D.C. 2015) (finding both tests similar and reaching the same result on both); *Palmer*, 867 F. Supp. 2d at 123-24 (same).[3]

    **c.   The *Spirides* Test**

The D.C. Circuit has simplified the method by which courts must evaluate the relationship between a putative employer and employee. *Redd*, 232 F.3d at 938.  In *Redd*, the Circuit explained that the main consideration for the Court is the extent to which the putative employer has the "right to control the means and manner of the worker's performance." *Id.*; *see also Spirides*, 613 F.2d at 831 (instructing courts to "analy[ze] the 'economic realities' of the work relationship").  "[I]f the putative employer has 'the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.'"  *Redd*, 232 F.3d at 938 (quoting *Spirides*, 613 F.2d at 831-32).  After analyzing the question of control, courts must also weigh: "the intent of the parties, primarily as reflected in the contract between the 'contractor' and its 'client'"; "whether contracting out work is justifiable as a prudent business decision"; "whether the business is exercising a degree of control that seems excessive in comparison to a reasonable client-contractor relationship in the same circumstances"; and "whether the relationship shares attributes commonly found in arrangements with independent contractors or with employees."  *Redd*, 232 F.3d at 939-40.

---

[3]    Although the D.C. Circuit has not definitively determined which test to apply, it favors the *Browning-Ferris* test when the issue of joint employment arises in this context.  *See Redd v. Summers*, 232 F.3d 933, 940 (D.C. Cir. 2000) (commenting that the *Spirides* test is likely "ill-suited to an analysis of whether an employee of an independent contractor is also an employee of the contractor's client").

Viewing the facts in a light most favorable to Stanton and drawing all reasonable inferences in her favor, there is no genuine dispute that the Corps was Stanton's joint employer under the *Spirides* analysis.

First and foremost, there is no dispute that both parties intended and had an understanding that the Corps was *not* Stanton's employer.  Stanton admitted on numerous occasions that she was not an employee of the Corps:

> Q:          Do you get a [Common Access Card] issued to you?
>
> Stanton:    We don't, no.
>
> Q:          Okay.  Because you guys are contractors on the boat, not employees?
>
> Stanton:    Yeah.

*See* ECF No. 9-4 at 42:11-42:22. Stanton further admitted "[W]e're pretty much independent contractors.  So we just go like whoever has a contract, whoever needs us to work, whoever is available.  That's just – you just kind of go around from company-to-company if and when you're available."  *Id.* at 8:14-8:19.  As to her schedule, Stanton testified, "It's a nightmare . . . these employers, are providing all of our datasheets. I mean, they are providing – they're giving us our schedule. I mean, so they're providing everything like an employer would be, but they're not – they're still considering us independent contractors."  *Id.* at 19:14-19:19.

The Corps had the same understanding as Stanton.  ECF No. 9-11 at 2 ("No USACE employees acted as a supervisor to Ms. Stanton while she worked aboard the Wheeler.  Everyone on the Wheeler, including myself, considered Ms. Stanton a *contractor, not an employee*.") (emphasis added).  The contract here, moreover, was between the Corps and East Coast Observers, not Stanton, and was for a finite three-month period, suggesting that Stanton was an independent subcontractor.  *See* ECF No. 9-12 at 3.  Stanton's stated understanding of her employment status

11

weighs significantly in this Court's analysis.  *See* ECF 9-4 at 42:11-42:22; *see also Palmer*, 867 F. Supp. 2d at 123 ("Given that Plaintiff asserts that she was a contractor and does not claim to have been an employee in either law or fact, that is the end of the matter.").

There is also no genuine dispute as to whether the Corps (as opposed to East Coast Observers) controlled the means and manner of Stanton's employment.  Specifically:

- The Corps was almost entirely uninvolved with Stanton's day-to-day duties.  The observers on board determined their own schedules, working in alternating 12-hour shifts.  ECF No. 9-11.

- Neither Captain Morehouse nor any other Corps employee assigned or directed Stanton to complete any job-related tasks or duties.  *Id.*  Captain Morehouse's discussions with Stanton were logistical in nature or were responsive to any questions or concerns she had while on board the Wheeler.  *Id.*

- Stanton reported to the "lead observer" Leslie Osborne, an employee of East Coast Observers, not the Corps.  *Id.*

- Stanton was not issued a Common Access Card aboard the Wheeler, preventing her from accessing the library computers.  ECF No. 9-4 at 42:11-22.

- East Coast Observers, rather than the Corps, provided Stanton with the tools to tag endangered species, one of Stanton's primary responsibilities while on the Wheeler.  ECF No. 9-4 at 20:4-20.

- The Corps only provided Stanton with room and board, access to a phone, television, fax, and copy machine.  ECF No. 9-8.  The contract between East Coast Observers and the Corps stipulated that Stanton was to reimburse the Corps for the cost of lodging and food.  *Id.*

- East Coast Observers was responsible for paying Stanton for her term of employment, whereas the Corps had no responsibility to Stanton for any compensation or benefits. *See* ECF No. 10-2 at 3, 6.

- East Coast Observers provided a unique service outside of the Corps' purview as Stanton's job as an observer was specialized, required a high level of skill, and was not an integral part of the Corps' mission. *See* ECF 9-11 at 1.

In light of these facts, it is clear that the Corps had minimal, if any, level of control as to Stanton's day-to-day duties or terms of employment.

Nor is there a triable issue as to whether the Corps had the ability to terminate Stanton. *Id.* at 2 ("I did not have the ability of authority to terminate Ms. Stanton."); *see also* ECF No. 9-4 at 79:4-7 (Stanton admitting that she reported the assaults to the Corps first because she believed East Coast Observers would terminate her for making a report: "So it's like you go to the observer providers, and they're not going to do anything.  There's nothing they're going to do except pull you off, fire you, and just leave you hanging.").  Although Stanton claims that the Corps fired her after forcibly removing her from the vessel under threat of arrest, she offers no evidence that the Corps could or actually did terminate her employment.  ECF No. 10-1 at 11.  Though Captain Morehouse provided for Stanton's escort off the Wheeler after she made the allegations of harassment, the purpose of this was to ensure her safety and so that she might give a statement to authorities.  ECF No. 9-5 at 4-5.  Upon close examination of her arguments, Stanton does not directly claim that Captain Morehouse fired her or had the authority to do so.  Rather, it appears that Stanton's argument is that the *act* of her removal led to her termination.  ECF No. 10-1 at 10; *See* ECF No. 10-1 at 11 ("Upon removal from the Wheeler, Plaintiff's employment was terminated.").

The record actually reflects that Stanton avoided contact with East Coast Observers upon leaving the Wheeler. *See id.* at 40 ("The Complainant produced no evidence that any management official at East Coast Observers told her they would no longer employ her . . . the company president attempted to contact her several times after she left the Dredge Wheeler and the Complainant delayed responding."). In fact, Stanton admits she did not report the assault to East Coast Observers because she knew that East Coast Observers would fire her if they knew. ECF No. 9-4 at 79:4-7. Indeed, Stanton was still an employee of East Coast Observers even after leaving the Wheeler. *See* ECF No. 10-5 at 39 ("The Complainant has produced no evidence that anyone at East Coast Observers terminated her employment on December 22, 2014.").

Accordingly, notwithstanding Stanton's attempts to claim that Captain Morehouse had the ability to hire and fire her, the record reflects there is no genuine dispute that he did—or could—do so. *Id.* ("There is no evidence that Captain Morehouse, or anyone in a position of authority at the U.S. Army Corps of Engineers, recommended or encouraged East Coast Observers to terminate [Stanton's] employment.").

Instead of pointing to specific evidence sufficient to raise a genuine dispute as to these facts, Stanton relies largely on the EEOC finding in arguing that there was a joint employer relationship. *See* ECF No. 10-1 at 8-12. Namely, Stanton argues that she lived and worked on the Corps' ship and the Corps, specifically Captain Morehouse, took responsibility for addressing Stanton's allegations of harassment. *Id.* These two facts, however, do not weigh in favor of a joint-employer relationship in this case. The only place Stanton could do her work was aboard the vessel. Moreover, as discussed further below, the fact that Captain Morehouse took action when there was an allegation of assault on his vessel is not by itself enough to raise a triable issue. *See* ECF No. 9-5 at 4-5. Considering the economic realities of the relationship between Stanton and

the Corps as well as the Corps' almost complete lack of involvement in Stanton's work, there are no facts sufficient to raise a genuine dispute that the Corps was Stanton's joint employer under the *Spirides* test.

### d. The *Browning-Ferris* Test

The *Browning-Ferris* test leads the Court to the same conclusion.  Under this analysis, the Court must assess "whether 'one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.'"  *Redd*, 232 F.3d at 938 (quoting *Browning-Ferris*, 691 F.2d at 1123).  Factors for the Court to consider under the *Browning-Ferris* test include: "[(1)] the alleged employer's authority to hire and fire the relevant employees; [(2)] the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; [(3)] the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and [(4)] the alleged employer's actual control of employee records, such as payroll, insurance, or taxes."  *In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683 F.3d 462, 469 (3d Cir. 2012).  In addition, a court is permitted to look for other "indicia of 'significant control'" to suggest that a given employer was a joint employer of an employee.  *Id.*

As noted above, the record reflects that the Corps had no legal authority to hire or fire either observer on board the Wheeler, no authority to promulgate work rules or assignments, and no authority to set compensation, benefits, schedules, or rates or methods of payment.  *See* ECF No. 10-2 at 6; ECF No. 9-8.  Furthermore, the Corps was not involved in employee supervision or employee discipline and did not exercise or maintain any control over employee records.  *Id.*

Stanton's term of employment on the Wheeler was for a finite period of three months. *See* ECF No. 9-8 at 1.

Put simply, the facts reflect that Stanton was a contractor, employed by East Coast Observers, while aboard the Wheeler. Despite Stanton's argument to the contrary, the Corps merely providing Stanton with living quarters and responding to a report of harassment or assault does not by itself create an employer-employee relationship or demonstrate control. *See Al-Saffy*, 827 F.3d at 97 (emphasizing the level of control, as in reporting to a supervisor or a putative employer's role in firing an employee as determinative in the employer-employee analysis). Although Stanton's place of employment in this case, a ship operating at sea, created a unique dynamic where the captain was responsible for all individuals on board, Stanton's argument to extend an employment relationship by virtue of this dynamic is unavailing. Captain Morehouse responded, pursuant to maritime rules, to allegations of sexual and physical assault that occurred on board his ship. *See* ECF No. 9-9 at 8 ("The Capt. followed maritime rules for reporting the incidents notifying the Coast Guard. The local authority, Brazoria County Sheriff's Office, and the Army EAP were also notified of the allegations."). He only threatened forcible removal after Stanton disobeyed his request for Stanton to remain in her room. *See* ECF No. 9-5 at 4. Captain Morehouse's response did not equate to her termination – in fact, Stanton was still employed by East Coast Observers on December 22, 2014 – nor did it instantaneously create an employee-employer relationship. ECF No. 10-2 at 39. Ultimately, the Court is bound by the central inquiry of whether a putative employer exercised sufficient control over the employee. *Id.* Here, even viewing the facts in a light most favorable to Stanton, the level of control exercised by the Corps over Stanton was minimal.

"When a legal standard requires the balancing of multiple factors, as it does in this case, summary judgment may still be appropriate even if not all of the factors favor one party." *Enterprise*, 683 F.3d at 471; *see also Moreau v. Air France*, 356 F.3d 942, 952 (9th Cir. 2004) (noting that two factors favoring a finding of joint employment do "not outweigh the numerous significant factors . . . which weigh heavily against finding a joint employer relationship," and finding summary judgment appropriate).  This is such a case.  The evidence is such that no reasonable juror could find that the Corps was Stanton's joint employer.  Because Stanton lacks standing to bring a Title VII claim under either the *Spirides* or the *Browning-Ferris* tests, the Court need not proceed to her harassment claim and will grant the Corps' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Corps' motion for summary judgment, ECF 9.  A separate order will issue.

**SO ORDERED**.

Date: November 14, 2022

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE